IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 13, 2024 Session

**STATE OF TENNESSEE v. JAMES ALLEN WORLEY**

**Appeal from the Circuit Court for Grundy County**
**No. 6286    Justin C. Angel, Judge**

_____

**No. M2023-00867-CCA-R3-CD**

_____

Following a jury trial, the Defendant, James Allen Worley, challenges his convictions and sentences for four counts of rape of a child and one count of attempted rape of a child on multiple statutory and constitutional grounds. Specifically, the Defendant contends that the trial court erred by 1) admitting the forensic interview of the child victim on the grounds of the forensic interviewer's lack of requisite experience and improper authentication by the victim, 2) denying the Defendant's motion to suppress his statements to law enforcement on the ground that they occurred during an impermissibly lengthy warrantless detainment, and 3) excessively sentencing the Defendant to consecutive terms on all counts. After a thorough review of the record and consideration of the parties' arguments, we remand the case to the trial court for entry of corrected judgment forms in counts 1 through 5. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

KYLE A. HIXSON, J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

B. Jeffrey Harmon, District Public Defender; and Kendall S. Jones (on appeal) and Robert G. Morgan (at trial), Assistant District Public Defenders, for the appellant, James Allen Worley.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas (at oral argument) and Caroline Weldon (on brief), Assistant Attorneys General; J. Michael Taylor, District Attorney General; and David O. McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.    FACTUAL AND PROCEDURAL HISTORY

This case arises out of the Defendant's sexual abuse of the victim,[1] his biological daughter, on multiple occasions between January 1, 2018, and October 16, 2019.  The victim was six and seven years old at the time of the offenses.  The victim initially disclosed the abuse to her mother, who took her to the Grundy County Sheriff's Office on October 16, 2019.  The victim disclosed additional information to an investigator there.  Later that day, the investigator spoke with the Defendant at the police station, and the Defendant denied the allegations but conceded that his memory could have been faulty due to methamphetamine use.  Based upon the information provided by the victim and her mother, as well as the Defendant's equivocating statement, the investigator arrested the Defendant at the conclusion of the interview.  No formal charging instruments were filed at that time.  The next day, on October 17, 2019, the victim gave a forensic interview during which she made additional disclosures about other instances of her sexual abuse by the Defendant.  Shortly after this, the Defendant was interviewed by law enforcement again, and he confessed to sexually abusing the victim.  On October 18, 2019, approximately forty-four hours after the Defendant's initial detention, an arrest warrant issued charging the Defendant with six instances of rape of a child.

A Grundy County grand jury subsequently indicted the Defendant and charged him with five counts of rape of a child.  *See* Tenn. Code Ann. § 39-13-522 (2013).  Prior to trial, the State filed a motion to admit the forensic interview of the victim.  The Defendant filed a motion to suppress his statements to police made following his detention but prior to the issuance of arrest warrants.  An evidentiary hearing for both motions ensued on August 13, 2021.

### A.    Pretrial Hearing

#### 1.    Forensic Interview

The Defendant objected to the admission of the forensic interview based upon the forensic interviewer's professional experience at the time she conducted the interview, which he contended did not meet the statutory requirements.  *See* Tenn. Code Ann. § 24-7-123(b)(3)(C) (2015) (requiring the forensic interviewer to have had "experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas: (i) Child protective services; (ii) Criminal justice; (iii)

---

[1] It is the policy of this court to protect the identity of victims of sexual offenses.

Clinical evaluation; (iv) Counseling; or (v) Forensic interviewing or other comparable work with children"). The Defendant did not challenge the admissibility of the forensic interview on any basis other than the forensic interviewer's qualifications, and then only as to the necessary three years' fulltime professional experience in the fields enumerated in the statute. *See id.*

At the outset of the hearing, the trial court indicated that it had already watched the video of the forensic interview, and the Defendant agreed with the trial court's assertion that it did not need to be played during the hearing. In fact, defense counsel indicated it would not be appropriate to play the video of the interview in the courtroom and stated a desire only to ensure that the trial court had viewed it in a private setting. The video recording of the forensic interview was made an exhibit to the hearing without a challenge to the authenticity of its content.

Rachel Fuller testified that she had been conducting forensic interviews for approximately two-and-a-half years at the time of the victim's interview. Prior to her employment at the Coffee County Children's Advocacy Center in this role, she had been an elementary school teacher for five years. Ms. Fuller indicated that, as a kindergarten and second-grade teacher, she had gained extensive experience with young children related to dispute resolution, problem solving, and asking questions, which often required her to talk to the children privately to determine what had happened during a disputed situation. On cross-examination, Ms. Fuller defined her role in conducting forensic interviews as having "a structured conversation with a child for purposes of eliciting as much information as possible, in as neutral and nonleading way as possible to assist in furthering an investigation." She stated the similarities between her work as a forensic interviewer and her work as an elementary school teacher included these types of conversations with children, explaining, "They're both me asking questions, trying to . . . find out more information. . . ." Prior to concluding her testimony, Ms. Fuller affirmed that she had not tampered with the video recording in any way.

The State next called the victim to testify regarding the video recording of the forensic interview. After affirming that she knew the difference between the truth and a lie and being placed under oath, the victim testified that the day before the hearing she had reviewed the video of her forensic interview with Ms. Fuller, that it accurately portrayed their conversation, and that she had told the truth during that conversation. On cross-examination, the Defendant inquired into numerous specific portions of the forensic interview, and the victim acknowledged remembering some of the things she had said in the video while stating that she did not remember other things from the video. No further proof was introduced on this issue at the hearing.

In its argument, the State first drew the trial court's attention to the victim's testimony regarding the truthfulness of the video, and the State also confirmed that the victim would be available for cross-examination at trial. In relation to Ms. Fuller's qualifications, the State emphasized that the statutory requirements included experience "comparable [to forensic interviewing], not identical, comparable work with children." The State highlighted the testimony from Ms. Fuller regarding her responsibilities as a kindergarten and second-grade teacher and contended that this experience constituted "other comparable work with children" as contemplated by the statute. *See* Tenn. Code Ann. § 24-7-123(b)(3)(C)(v). The State asserted that teachers have similar duties interacting with children such that Ms. Fuller's five years of teaching experience was sufficient to bridge the gap of the few months she lacked in experience as a forensic interviewer.

The Defendant argued that elementary school teaching experience did not align with what Tennessee courts had decided constituted "other comparable work with children." *See State v. Clymer*, No. M2016-01124-CCA-R3-CD, 2017 WL 5197292, at *11 (Tenn. Crim. App. Nov. 9, 2017) (holding that fulltime professional experience working with children who had brain injuries and their families to educate and provide resources for them met the requirements of this portion of the statute). The Defendant contended that Ms. Fuller's experience as a teacher was not comparable based upon its dissimilarity to the forensic interviewer's experience in *Clymer*.

At the conclusion of the argument on this issue, the trial court analyzed each of the statutory considerations required by Tennessee Code Annotated section 24-7-123. Specifically, the trial court first found that "the child testifie[d], under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination." Tenn. Code Ann. § 24-7-123(b)(1). The trial court next found that the video recording, which it had reviewed prior to the hearing, possessed particularized guarantees of trustworthiness. *See id.* § -123(b)(2). The trial court further found that the interview was conducted by a forensic interviewer employed by a child advocacy center meeting the statutory requirements of Tennessee Code Annotated section 9-4-213 and that Ms. Fuller had satisfied all of the necessary education and training requirements. *See id.* § -123(b)(3)(A), (B).

The trial court then assessed Ms. Fuller's experience in the context of "other comparable work with children." *See id.* § -123(b)(3)(C)(v). In finding that Ms. Fuller's work as an elementary school teacher satisfied the experiential requirements of the statute, the trial court agreed with the State that the employment relied upon need not be identical to forensic interviewing. The trial court also stated its understanding that the "comparable"

- 4 -

language in the statute was meant to fulfill "the purpose [of demonstrating] . . . fulltime work experience with children." The trial court emphasized that Ms. Fuller's teaching experience required skills comparable to forensic interviewing because "[teachers] have to communicate with children . . . [and] have to speak to them on their level . . . [which Ms. Fuller did] virtually every day for years. . . ." After articulating on the record its consideration of all of the statutory factors, the trial court ruled that the video of the forensic interview was admissible at trial.

## 2. Defendant's Statements to Law Enforcement

The evidentiary hearing then proceeded to the Defendant's motion to suppress his statements made to law enforcement. The Defendant contended that his October 17, 2019 confession to Investigator Larry Sims of the Grundy County Sheriff's Office ("GCSO") was the product of an impermissibly lengthy warrantless detainment and averred that a "72-hour investigative hold" had been placed on him to keep him in custody in lieu of charges. The Defendant asserted in his motion that the delay was for the purpose of gathering evidence to support the arrest.

Investigator Sims testified that, on October 16, 2019, he was contacted by Officer Gary Goodwin of the GCSO following the victim's mother reporting that the victim had been sexually abused by the Defendant. Officer Goodwin had begun conducting the initial interview and requested Investigator Sims to join them. The victim's mother recounted what she had observed and what both the victim and the Defendant had told her regarding the allegations of sexual abuse. All of these discussions were recorded on Officer Goodwin's body camera, and the video recording was made an exhibit to the hearing.

In the recording, the victim's mother said that, on the morning of Saturday, October 12, 2019, she exited her bedroom and saw the victim run out of the bathroom while the Defendant was taking a shower. The victim's mother found this unusual and went to the victim's bedroom to ask what she had been doing. The victim initially did not respond, other than to say that it was a secret, but eventually disclosed to her mother with both words and gestures that the Defendant had made her put his penis in her mouth and stimulate it with her hand while he was in the shower. The victim's mother then entered the bathroom and asked the Defendant what had happened, to which he responded that the victim had come in to use the bathroom while he was in the shower. At that time, the victim's mother did not confront the Defendant with the victim's disclosure but instead left the residence with the victim and went to the home of the Defendant's mother.

The victim's mother and the victim later returned to the family home, and the victim's mother confronted the Defendant with the allegations. At that time, the Defendant

denied any wrongdoing and refused to discuss the matter further with the victim's mother. The Defendant stayed in the couple's bedroom all of the following day, October 13, 2019, stating that he wanted to avoid the victim so that he "could not be accused of anything." While the Defendant was at work on October 14, 2019, the victim commented to her mother that her parents' bedroom smelled "like [the Defendant]'s penis[.]" The victim's mother then attempted to elicit more information from the victim about what the Defendant had been making her do. At this point, the victim disclosed that the Defendant would come into her room while the victim's mother was asleep and tell the victim to do "the mouth thing" because it helped him sleep. The victim's mother and the victim then left the residence and spent the night at the victim's maternal grandmother's house. During this absence, the victim's mother communicated with the Defendant by text message, and the two agreed to take the victim to the health department the following day to determine whether she or another child who might have confided in her needed help based upon her statements and apparent knowledge of the practice of oral sex.

When the Defendant returned from work on Tuesday, October 15, 2019, it was "too late" for the couple to take the victim to the health department that day, but the victim's mother continued to insist to the Defendant that something needed to be done. The Defendant then retrieved a rifle and placed it on the bed between himself and the victim's mother, indicating that it was necessary based upon what he was about to tell her.[2] The Defendant then informed the victim's mother that he had been masturbating and watching pornography on his laptop at an unspecified point in the past, and the victim had walked in and seen this. He further stated that he explained to the victim at that time what she had seen on the laptop, and that was where her knowledge of these sexual matters came from. He also admitted to the victim's mother that he had secretly been using methamphetamine habitually, which she had previously indicated would prompt her to leave him and take the victim with her. Out of fear that the Defendant would attempt suicide, the victim's mother remained in the home with the victim and "acted like nothing was wrong" for the rest of the evening.

After the Defendant left for work the following day, October 16, 2019, the victim's mother asked the victim if she had ever walked in on the Defendant watching anything on the computer, and the victim denied that this had ever occurred. The victim also disclosed that on other occasions when the victim's mother had been working, the Defendant would take her to "the blue house" and make her do "the mouth thing" while they were there. The victim's mother stated that she recalled numerous occasions when the Defendant and the victim had gone to spend time together at the Defendant's deceased great-grandmother's

_____

[2] There is conflicting testimony in the record regarding whether the Defendant stated that he himself or the victim's mother would need the rifle, but both parties appeared to understand that he was threatening suicide.

vacant house, which was blue and white. Because the Defendant had possession of the victim's mother's cell phone and she did not have her own vehicle, she went to a neighbor's house to call for a ride. The victim's mother then took the victim to the health department, but she was told to proceed to the GCSO based on the nature of the complaint.

After the victim's mother finished her account of events to Investigator Sims and Officer Goodwin, the victim was brought into the room with the three of them, and she was asked to talk about what had been happening with the Defendant. Officer Goodwin's body camera also recorded this conversation, wherein the victim stated that she was seven years old and in the second grade. She told Investigator Sims that "a lot of times," starting when she was in the first grade, the Defendant made her put his penis in her mouth and stimulate it with her hand. Using words and gestures, she displayed how the Defendant would put his hand on the back of her head and move it back and forth while his penis was in her mouth. The victim further stated that this made her gag and feel sick, but she did it because the Defendant told her to. The victim also gestured with her hand to demonstrate how the Defendant told her to stimulate his penis, and she stated that he would not let her take a break when her hand was tired because she had to keep doing it until "some stuff came out." She described the "stuff" as white and explained that it also came out when she did "the mouth thing." The victim stated that when this happened, she would spit it out on a tissue, the ground, a towel, in the toilet, in the bathtub, in the sink, or on the floor of her bedroom. When asked if the Defendant had ever touched her private areas, the victim stated that the Defendant had put his penis in her "butt" one time. The victim said that this hurt, she cried, and she thought it had happened when she was in the first grade. She had not previously disclosed this to her mother, whose shock upon hearing this statement prompted Investigator Sims to ask the victim's mother if she needed to take a break.

At the conclusion of this discussion, the victim's mother received information about how the investigation would proceed, and she was instructed that she and the victim both were to have no contact with the Defendant. Investigator Sims explained that the victim would need to have a forensic interview as part of the investigation, and he emphasized that his own expertise was in questioning adults, but the forensic interview would involve individuals who specialized in speaking with children. However, Investigator Sims relayed to the victim's mother that, based upon his belief in the victim's statements, he would arrest the Defendant that same day.

Soon after, Investigator Sims and Officer Goodwin went to the Defendant's place of work and asked him to accompany them to their office, which he voluntarily did. This initial encounter and the subsequent interview with the Defendant were recorded on Officer Goodwin's body camera and the camera in the interview room. The video recordings from both sources were made exhibits to the hearing.

In the recording, Investigator Sims began the interview by reading the Defendant his *Miranda* rights, and the Defendant indicated that he understood those rights both verbally and by signing a waiver form. The Defendant stated that he and the victim had a close relationship and said that the victim's mother had brought the allegations of sexual abuse to his "attention" a few days prior. The Defendant went on to say that he had been using methamphetamine habitually and repeated his claim that the victim had recently walked in on him while he was masturbating and watching pornography. He claimed that, at the time of the interview, he had not used methamphetamine for several days and that he only used "a very small amount" when he did so.

The Defendant stated that he knew the victim had seen the pornography when she walked in on him, but he did not know how long she had been standing there before he noticed her presence. Investigator Sims then articulated the difference between seeing sexual acts and being able to describe what they felt like, and he told the Defendant he believed the victim's version of events. The Defendant responded that no sexual abuse had occurred that he was "aware of" but indicated that his drug use may have affected his memory. At the conclusion of this interview, the Defendant was placed under arrest and told that he would be charged with "rape of a child, three counts." Investigator Sims testified that at that point, he handed "custody over to booking . . . to take care of the rest."

The following morning, Investigator Sims observed the victim's forensic interview from a separate room at the Children's Advocacy Center, and he returned to the jail to interview the Defendant again afterward, which was approximately twenty-two hours after his first interview with the Defendant. The second interview was also recorded on the camera in the interview room, and the video recording was made an exhibit to the hearing.

In the recording, the Defendant acknowledged understanding of his *Miranda* rights in the same manner as he had the previous day, and he also provided consent for a DNA sample collection and the search of his two trucks. The Defendant asked why it was "taking so long" for him to get a bond, and Investigator Sims replied that they were "probably waiting on [him]" to finish his report. Investigator Sims then informed the Defendant that the victim had been interviewed again and made additional disclosures, but he did not tell the Defendant the details of the new allegations. The Defendant initially responded that his methamphetamine use changed him into a "totally different" person and caused him to "black out," but he "thought" he had done what he was being accused of because he did not believe the victim would lie. After further questioning concerning his lack of memory, the Defendant admitted that he had sexually abused the victim on multiple occasions. He stated that he did not remember every situation, but he estimated that he had orally penetrated the victim "at least twice[,]" and he was "positive" that he anally penetrated her

only one time. The Defendant described the anal penetration as occurring on the floor in the bathroom of their home with the victim kneeling in front of him, and the oral penetration as occurring in his brown truck with her seated on the floorboard in front of him while parked at his great-grandmother's house. The Defendant also described the incident from October 12, 2019, stating that he was in the shower and the victim was standing beside him outside of the shower when he orally penetrated her, and she spit his ejaculate into the bathtub. The Defendant confirmed that he had told the victim not to talk about this with anyone else.

Investigator Sims testified that he started "working on the paperwork . . . that evening" but that Officer Goodwin had started a report the previous day, October 16, 2019. Investigator Sims's final report contained the narrative that was attached to the affidavit supporting the issuance of an arrest warrant. He did not finish this report and narrative until "late that evening" on October 17th "due to the fact that we had other things we were doing with the case."[3] An arrest warrant charging the Defendant with "rape of a child x6" was filed on the morning of October 18, 2019, approximately forty-four hours after the Defendant's arrest. Investigator Sims's report was attached in support of the warrant, and the narrative filled two pages with single-spaced type. Investigator Sims also testified that he had reviewed the booking records and confirmed that he had not placed a seventy-two-hour investigative hold on the Defendant during the initial detention.

The jail administrator, GCSO Captain Melinda Meeks, testified that her responsibilities included communicating with the general sessions court judge to have a bond set in the Defendant's case. Capt. Meeks exchanged text messages with the judge on the morning of October 17, 2019, regarding the Defendant's charges. At approximately 9:00 a.m., the judge set the Defendant's bond at $30,000.00. However, at 9:18 a.m., the judge rescinded this order, stating instead "no bond for now." Capt. Meeks testified that, in the interim, either she had spoken with the judge by phone, or the judge had called another member of the GCSO, but that she could not recall which had occurred. She also testified that, in the case of charges like the Defendant's, she was required to advise the sheriff of the bond amount once it was set, and she had done so on this occasion. In any event, shortly after the initial bond was set, more information about the Defendant's

---

[3] Investigator Sims's report and warrant narrative were not made exhibits to the hearing. However, the copy of the report in the technical record indicates that after his second interview with the Defendant, Investigator Sims went to the family's residence. The victim's mother signed a consent form for a search of the residence, whereupon Investigator Sims took photographs of areas identified by the victim the previous day as places she had spit out the Defendant's ejaculate. Investigator Sims also removed a section of the carpet in the victim's bedroom for biological testing after the victim approximated the position from which she spat the ejaculate. During this same time period, another officer went to the Defendant's parents' residence to retrieve the vehicles belonging to the Defendant for additional searches and biological testing.

charges was conveyed to the judge and he elected not to set a bond at that time. Capt. Meeks testified that she too had reviewed the booking records and confirmed that a seventy-two-hour hold had not been placed on the Defendant.

At the conclusion of this proof, defense counsel stated that the testimony at the hearing was not what he had expected regarding the placement of a seventy-two-hour hold but argued that the delay in filing warrants and setting a bond was nonetheless unreasonable. The State responded that the Defendant was not being held for investigative purposes and the delay was not unreasonable, nor was it impermissibly lengthy. The trial court ruled that "[the Defendant] was not held unreasonably, he was not held in order to collect more evidence, and he wasn't held . . . for delay's sake. He was . . . lawfully arrested and being detained, and during that time new evidence came out, it's just how investigations go." The trial court denied the Defendant's motion to suppress.

B.      Trial

A two-day jury trial commenced on August 25, 2021. The victim's mother testified about her relationship and conversations with the Defendant and described her actions after the victim disclosed the abuse to her, as set forth above. The State then indicated it would next call Ms. Fuller to testify. At that time, the Defendant renewed his objection to the introduction of the forensic interview based upon Ms. Fuller's work experience, which the trial court overruled. Ms. Fuller then testified about her work at the Children's Advocacy Center and her forensic interview of the victim. When the State moved to introduce a recording of the forensic interview, the Defendant stated he had "[n]o new objection," and the recording was received into evidence. At the conclusion of Ms. Fuller's testimony, the recording of the forensic interview between Ms. Fuller and the victim was published to the jury.

The recording showed that, prior to asking any questions about sexual abuse, Ms. Fuller told the victim to correct her if she made any mistakes, to tell her if the victim did not know or understand something, and not to guess if the victim forgot something. The victim interacted with Ms. Fuller during these explanations and displayed understanding of Ms. Fuller's instructions as well as what it meant to tell the truth. When Ms. Fuller asked the victim if she felt safe with various members of her family, the victim stated she only "kind of" felt safe with the Defendant because he liked to do things that she did not like to do. The victim then disclosed to Ms. Fuller with words and gestures that the Defendant made her stimulate his penis with her hand and mouth until "stuff" came out of his penis and that after she did so, she would spit the "stuff" out. The victim stated that she was six years old the first time that it happened, when the Defendant showed her a

video on his phone of someone doing "the mouth thing," and then made her "practice" on his penis what she had seen in the video.

The victim told Ms. Fuller that "the mouth thing" had happened "probably twenty times" at "the blue house" and that it made her feel sick. She described sitting in front of the Defendant on the floor of his truck while he was seated when she did "the mouth thing" at "the blue house" and said that the Defendant took a video of her doing this and showed it to her before he deleted it. The victim went on to describe other occasions where the Defendant made her do "the mouth thing" in her bedroom and in the bathroom of their home while the victim's mother was in her bedroom working or sleeping. The victim demonstrated how she would use her hand to "make [the Defendant's penis] try to be bigger" when she did "the mouth thing" and said that the Defendant had shown her how to do this.

When asked if the Defendant's penis had touched any other part of her body, the victim said that he "put it in [her] butt and it hurt." She described being naked in the bathroom on her hands and knees with the Defendant "right behind" her and said that when the Defendant put his penis in "the hole in [her] butt," it felt like something was "biting" her and she cried. The victim said that the Defendant told her at the time that he would not do that again but that he later said that they could "try that thing again" the next time they went to "the blue house."

The victim stated that on one occasion at "the blue house," the Defendant had put his penis in her "vagina" but "not in the hole." She said that she had been wearing a two-piece bathing suit, but the Defendant told her to take the bottoms off, and he then made her sit on his lap while he was not wearing any clothes. The victim explained that the Defendant typically did not wear a shirt unless he was "going to his buddy's house" and that any time she did something to his penis, he was not wearing any clothes. She confirmed that the Defendant had told her not to tell her mother about any of this because "it would make her mad," but when the victim's mother saw her run out of the bathroom and asked what happened, she told the truth and "probably ruined [the Defendant]'s day."

After the recording was played, the victim was called to testify. The victim confirmed that she had watched the recording of the forensic interview within the past two weeks, she had told the truth during the interview, and the video recording accurately captured her conversation with Ms. Fuller. On cross-examination, the victim volunteered very little information, mostly answering only "yes" or "no," and she sometimes provided conflicting responses to the questions posed by defense counsel. She also often responded that she did not know or did not remember when asked about the timing of the abuse, the order in which the incidents occurred, or to whom she had spoken after her initial

- 11 -

disclosure. However, when asked about the allegation of anal penetration, the victim stated that it had occurred in a tent and not in the bathroom of their home. She also stated her belief that she had told Ms. Fuller the same thing in her forensic interview.

Investigator Sims testified about the investigation he conducted in this case, and video recordings of his October 16th and October 17th interviews with the Defendant were played for the jury, with some redactions as agreed to between the parties. At the conclusion of Investigator Sims's testimony, the State rested its case-in-chief. The State's election of proof as to each offense was then announced to the jury: count 1 alleged anal penetration in the bathroom; count 2 alleged oral penetration without ejaculation in the Defendant's brown truck; count 3 alleged oral penetration in the bathroom whereupon the victim spit the Defendant's ejaculate into the bathtub; count 4 alleged oral penetration in the victim's bedroom whereupon the victim spit the Defendant's ejaculate on the carpet and also possibly in the sink; and count 5 alleged vaginal penetration.

During the defense's proof, the Defendant's father testified that he had familiarized himself with the Defendant's home through doing repairs on the interior, and he estimated that the bathroom was approximately twenty-five feet from the door of the bedroom that the Defendant shared with the victim's mother. The Defendant's mother testified that she had taken the victim's mother and the victim to her house on the day the victim made the initial allegations. She further testified that she recorded a conversation amongst the three of them about the allegations, which was then played for the jury, but that the content of this conversation did "not really" cause her concern. In the recording, the victim indicated that what she had told her mother was supposed to be a secret between her and the Defendant, stating, "I do that, but I don't tell nobody."

The Defendant then elected to testify in his own defense. He stated that he had not abused the victim but claimed he had explained "the mouth thing" and "the butt thing" to the victim after she had observed him watching pornography. The Defendant also claimed that he had used methamphetamine just before his first interview with Investigator Sims, but that he had lied about it at that time to avoid being prosecuted for his drug use. Contradicting his statements in the interview, the Defendant testified that he did not believe methamphetamine use could cause him "to rape somebody and not know it." On cross-examination, the Defendant stated that he had confessed to raping his daughter because he was trying to get the investigator to leave him alone, and that he was either high on methamphetamine or "coming down" from his methamphetamine use at the time. The Defendant claimed that the details he gave during his confession came from him being informed of the allegations by the victim's mother the week before he was interviewed.

At the conclusion of this proof, the Defendant moved for judgment of acquittal. The trial court denied the Defendant's motion as to counts 1 through 4, but reduced the charge in count 5 to attempted rape of a child based on the lack of evidence that penetration had occurred vaginally. Following deliberation, the jury convicted the Defendant of rape of a child as charged in counts 1 through 4 and of attempted rape of a child as charged to the jury in count 5.

## C.      Sentencing

The trial court held a sentencing hearing on January 11, 2022, following receipt of the presentence investigation and psychosexual evaluation reports. Andrew Thornton with the Tennessee Department of Correction testified at the hearing that he had conducted an interview with the Defendant and completed the presentence investigation report. Mr. Thornton worked in a unit that specialized in the supervision of sexual offenders, and he explained that the "containment" model used in such supervision was predicated on the Department of Correction's "non[-]rehabilitative" stance that the "drive to commit sexual offenses is never curable." Mr. Thornton stated that the Defendant spoke at length about his drug addiction in the interview but denied having committed the offenses for which he had been convicted. The Defendant told Mr. Thornton that his confession was the result of methamphetamine use and the investigators having "railroaded" him, and he repeatedly stated that there was no proof of the offenses. When Mr. Thornton asked why the victim would have said these things if they were not true, the Defendant told him he did not know but assumed the victim's mother had coached her to make these accusations against him.

Tressie VanHooser testified that she currently provided counseling services to the victim and had done so since October of 2019. Ms. VanHooser described the now nine-year-old victim as having a hard time explaining her emotions and that she did not understand "what happy is." She stated that "[a]ll [the victim] knows is being angry and being sad" and that the victim had declined significantly as her understanding developed about what the Defendant had done to her. The victim told Ms. VanHooser that she felt like "the only one in the world that this has happened to" and that she did not see a future for herself. When asked about her goals, the victim stated that she was "going to live in a cardboard box," that she "wasn't going to have any friends," and that she "wasn't going to have anything." Ms. VanHooser described the victim as "very negative" and unable to point out anything positive or identify something good that had happened to her on any given day.

The victim's mother testified at the hearing that the victim was "severely withdrawn and depressed and in a dark, dark place." She described how playful and affectionate the victim used to be, but she no longer wanted anyone to touch her. The victim's mother said

- 13 -

that the victim did "not have any kind of positive" because this had "ruined her life" and she felt "worthless." The victim's mother related that the victim was "living in torment every day. At seven years old she wanted to die. She would punch and slap herself, have meltdowns, and hated herself." When the Defendant had been released on bail prior to trial, the victim's mother stated that the victim was "scared to death" that she would see him and that they often had to leave public places because the victim would "break down crying and shaking" if she saw a man wearing overalls or smoking cigarettes out of fear that it was the Defendant. The victim's mother reported that the victim still had nightmares about the Defendant coming into her room to "make her do the mouth thing" and that the victim had been unable to sleep alone or in her own bedroom since the offenses occurred.

The State urged the trial court to impose the maximum sentence and run all counts consecutively for a total sentence of 172 years. Defense counsel did not argue for any length of sentence in particular but remarked that a sentence of eighty years was typical in the jurisdiction. The parties agreed that the Defendant would be sentenced as a Range II offender as required by the rape of a child statute.[4]

After hearing argument from the parties, the trial court stated that it had considered the evidence presented at trial and the sentencing hearing, the presentence report and psychosexual evaluation, the Strong-R assessment, and the principles of sentencing to determine the appropriate sentence for the Defendant's offenses. Related to the enhancement factors, the trial court found that the victim was particularly vulnerable due to her age, stature, and meek temperament in relation to the Defendant's large stature; the psychological injuries inflicted upon the victim were "severe"; the offenses were committed for sexual gratification; and the Defendant abused a position of private trust as the victim's father. *See* Tenn. Code Ann. § 40-35-114 (4), (6), (7), (14). As to mitigating factors, the trial court found factor (1) applicable in that the Defendant's criminal conduct neither caused nor threatened serious bodily injury, but gave this factor no weight. *See id.* § -113(1). The trial court noted that it had also considered the Defendant's lack of criminal history and support from his parents, but it did not find that either or both merited mitigation of the sentence.

The trial court also found that consecutive sentencing was permitted due to the Defendant's commission of two statutory offenses involving sexual abuse of a minor and the aggravated circumstances surrounding those offenses. *See* Tenn. Code Ann. § 40-35-115(b)(5). Based upon the father-daughter relationship between the Defendant and the victim, the time span of the undetected sexual offenses, the nature and

---

[4] No discussion occurred at the sentencing hearing regarding the proper sentencing range for count 5. However, we note that the Defendant had no criminal history prior to the commission of these offenses, and the trial court properly fixed the term of punishment for this conviction within Range I.

scope of the sexual offenses, and the residual physical and mental damage to the victim, the trial court found that consecutive sentencing was appropriate. The trial court also stated its understanding that the statute required "the length of sentence when consecutive in nature [to] be justly deserved in relation to the seriousness of the offense."

The trial court articulated at length its consideration of the seriousness of the offenses and the proof that had been introduced in this case. In remarking upon "how bad the proof was," the trial court stated,

> [The Defendant is] supposed to be the man of the house, the protector, the ideal person for [the victim] to model what she looks for maybe in a spouse one day, and [the Defendant] just did the exact opposite. [The Defendant] betrayed . . . hurt . . . scared . . . [and] did not protect [the victim].

The trial court acknowledged that the Defendant had put on a defense that was rejected by the jury, remarked that the Defendant's confession and the victim's account in her forensic interview were too accurate to have been planned or falsified, and stated that it was "scar[il]y accurate how close[ly] [the victim's] disclosure matched [the Defendant's] confession." The trial court remarked that it was alarmed by the scope of the sexual acts in this case, and it found the circumstances to be "[h]orrendous" and "[h]orrible. You couldn't make up this story." The trial court then stated that it tried to be consistent with typical sentences within the jurisdiction. However, it also emphasized that some cases are "just different" and called this case the worst it had ever seen, before concluding,

> I have to send a message to you and to anybody else about how if they're convicted of crimes such as this in my court and the factors allow for it, that I'm going to take severe action to make sure a proper sentence is set forth and that I do believe is justly deserved in relation to the seriousness of the offense.

After sentencing the Defendant to thirty-five years on counts 1 through 4 and ten years on count 5, the trial ordered all counts to run consecutively for an aggregate sentence of 150 years, stating that it wanted to "assure that [the Defendant] never touch[es] a child again for the rest of [his] life."

The Defendant filed a timely motion for new trial, which was heard on May 10, 2023. At the hearing, the Defendant encouraged the trial court to reconsider its rulings on the admissibility of the forensic interview and suppression of the Defendant's statements to law enforcement on the same grounds relied upon in the initial hearing. The Defendant also challenged the sufficiency of the evidence and the "excessive" sentence imposed by

- 15 -

the trial court. The trial court denied the Defendant's motion for new trial at the conclusion of the hearing, which was memorialized by written order on May 22, 2023.

The Defendant filed a timely notice of appeal.

## II.     ANALYSIS

### A.     Admissibility of Victim's Forensic Interview

The Defendant contends on appeal that the forensic interview of the victim should not have been admissible at trial. In large part, the Defendant relies on the arguments made at the pretrial evidentiary hearing regarding the statutory requirements for the experience of the forensic interviewer. However, the Defendant also argues that the State's failure to have the victim authenticate the recording of the forensic interview at the pretrial hearing and at trial before it was played to the jury constituted reversible error. He requests plain error review on this issue, having conceded that authentication was not challenged in the trial court. The State responds that the trial court properly exercised its discretion regarding the experience of the forensic interviewer. Additionally, the State responds that the victim properly authenticated the recording at the pretrial hearing and at trial, and the Defendant therefore cannot show the breach of a clear and unequivocal rule of law so as to justify plain error relief.

### 1.     Experience of the Forensic Interviewer

In order for a forensic interview to be admissible under Tennessee Code Annotated section 24-7-123, the trial court must determine in a pretrial hearing that, *inter alia*, the forensic interviewer

(C) Had experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas:
      (i) Child protective services;
      (ii) Criminal justice;
      (iii) Clinical evaluation;
      (iv) Counseling; or
      (v) Forensic interviewing or *other comparable work with children*[.]

Tenn. Code Ann. § 24-7-123(b)(3)(C) (emphasis added). Questions concerning the admissibility of a forensic interview rest within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *State v. Franklin*, 585 S.W.3d 431,

- 16 -

448 (Tenn. Crim. App. 2019). "An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence." *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014) (citing *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013)).

The parties on appeal agree that, at the time of the forensic interview in this case, Ms. Fuller had approximately two years and four months of experience as a forensic interviewer. The question before the court is whether the trial court abused its discretion in concluding that Ms. Fuller's five years as an elementary school teacher qualified as "other comparable work with children" to satisfy the remaining eight months of experience required under the statute.

The Defendant relies heavily on *Clymer* and its holding that experience as a traumatic brain care specialist qualified as comparable work with children. 2017 WL 5197292, at *11. However, we are unpersuaded by the Defendant's argument that this type of experience is dissimilar to Ms. Fuller's background in elementary school education. In *Clymer*, the forensic interviewer testified that she "[s]upported children that had sustained brain injuries as they transitioned back into home life and school by educating the families and providing resources as needed." *Id.* The trial court in *Clymer* focused on the forensic interviewer's "discussing and talking to children" as fitting the statutory criteria that aimed to ensure a forensic interviewer had knowledge of "child development and training that would apprise one to the point of being a trustworthy interviewer." *Id.* Therefore, the forensic interviewer's experience in *Clymer* having difficult conversations with children and educating both them and their families was held to be sufficient under the statute by a panel of this court. *Id.* Ms. Fuller's professional experience with children is not identical to that of the forensic interviewer in *Clymer*, but it need not be—just as it need not be identical to forensic interviewing—to qualify her under the statute.

By including the "comparable" language in section 24-7-123(b)(3)(C)(v), the legislature clearly intended to allow for a broader spectrum of prior experience to qualify beyond those professions specifically enumerated in the statute. While it is true that being a forensic interviewer is much different in many ways than being an elementary school teacher, the same could be said when one compares forensic interviewing to almost any other profession. But there are, as the trial court noted, many similarities between the two professions.

Importantly, we examine the trial court's conclusion on this point for an abuse of discretion. *See Franklin*, 585 S.W.3d at 448. On this record, we cannot say that the trial court applied an incorrect legal standard, reached an illogical or unreasonable decision, or based its decision on a clearly erroneous assessment of the evidence. *See McCoy*, 459

- 17 -

S.W.3d at 8. To the contrary, the trial court's explanation was logical and well-reasoned. In fact, the record in this case contains more details regarding Ms. Fuller's previous work with children than other cases where this court has found prior work experience to be comparable with that of a forensic interviewer. *See, e.g.*, *State v. Rodriguez*, No. W2022-00894-CCA-R3-CD, 2023 WL 3296376, at *5 (Tenn. Crim. App. May 8, 2023) (finding it "apparent [a forensic interviewer] worked in some capacity in 'comparable work with children' . . . as both a case manager and family advocate" without any proof in the record providing details of the forensic interviewer's prior job responsibilities or specific experience interacting with children), *no perm. app. filed*; *State v. Haven*, No. W2018-01204-CCA-R3-CD, 2020 WL 3410242, at *14 (Tenn. Crim. App. June 19, 2020) (under plain error review, holding no clear and unequivocal breach of a rule of law where forensic interviewer worked in "various social work positions for seven years" without further elaboration on her experience or her interactions with children in these roles). The trial court did not abuse its discretion. The Defendant is not entitled to relief.

### 2.     Victim's Authentication of the Recording

The Defendant has requested plain error review regarding the victim's authentication of the forensic interview. In conducting plain error review, our court will reverse for plain error only if the five following prerequisites are satisfied:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be present in the record before an appellate court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id*. at 283. In order to warrant plain error relief, the magnitude of the error must have been so significant "that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). Plain error relief should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). A defendant has the burden of persuading the appellate court that plain error exists. *Bledsoe*, 226 S.W.3d at 355.

The Defendant contends that the video recording of the forensic interview was published to the jury before the victim had authenticated it. Our supreme court has previously held that proper construction of Tennessee Code Annotated section 24-7-123(b)(1)[5] "requires the witness to authenticate the video recording *before* it is submitted, and to be available for cross-examination *at trial*." *McCoy*, 459 S.W.3d at 15. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Authentication may be established by the testimony of a witness with knowledge "that a matter is what it is claimed to be." Tenn. R. Evid. 901(b)(1). Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues[.]" Tenn. R. Evid. 901, Advisory Comm'n Comments.

In this case, the victim testified at the pretrial evidentiary hearing that she had reviewed the video and that it was an accurate recording of her telling the truth to the forensic interviewer.[6] No challenge was made that the recording had been altered or tampered with, nor was there any question that the victim would be available for cross-examination again at trial. At the conclusion of the hearing, the trial court analyzed the statutory factors of admissibility contained in Tennessee Code Annotated section 24-7-123, and it specifically made a finding that the requirement of authentication by the victim had been met. The victim's testimony about the veracity and accuracy of the video occurred prior to trial, and the recording had thus been authenticated by the victim as contemplated in the statute before it was published to the jury, regardless of the order of proof introduced later at the trial itself. *See State v. Ruzicka*, No. W2023-00134-CCA-R3-CD, 2024 WL 3387294, at *10 (July 12, 2024) (holding no plain error relief where the victim had authenticated the forensic interview recording at the pretrial hearing, and the State was therefore not required to reauthenticate the recording at trial), *no perm. app. filed*. As the video recording of the victim's forensic interview was properly authenticated, the Defendant cannot show a breach of a clear and unequivocal rule of law. There is nothing in the record to indicate that the recording was anything other than what the proponent claimed it to be. The Defendant is not entitled to plain error relief.

---

[5] This subsection states, "The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination[.]"

[6] The Defendant's reliance on this court's prior reversal for lack of authentication by the victim at trial ignores the distinction that authentication did not occur at the pretrial hearing in that case. *See State v. Stegall*, No. W2022-00628-CCA-R3-CD, 2023 WL 6319610, at *1 (Tenn. Crim. App. July 14, 2023) *no perm. app. filed*.

B.     Suppression

The Defendant contends that his statements to law enforcement should have been suppressed due to the investigator's delay in seeking an arrest warrant during his initial detention.  The Defendant claims that Investigator Sims's failure to swear out an arrest warrant immediately, instead continuing to investigate the allegations against the Defendant, amounted to a constitutional violation pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975).  The State responds that the trial court ruled correctly at the pretrial evidentiary hearing that the delay was not unreasonable.  We agree with the State.

At a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).  Therefore, we will uphold the trial court's findings of fact at a suppression hearing unless the evidence preponderates against them.  *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014) (citations omitted).  The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from [the] evidence."  *Id*. at 529 (citations omitted).  The lower court's application of law to the facts is reviewed de novo with no presumption of correctness.  *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).  Moreover, an appellate court on review may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress.  *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998).

The Fourth Amendment to the United States Constitution provides,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment is applicable to the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 650 (1961).  The Tennessee Constitution provides in pertinent part, "That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures[.]"  Tenn. Const. art. I, § 7.  Article I, section 7 "is identical in intent and purpose with the Fourth Amendment."  *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968).  Therefore, our courts generally interpret article I, section 7

consistently with the Fourth Amendment. *See State v. Reynolds*, 504 S.W.3d 283, 303 n.16 (Tenn. 2016).

Under these constitutional provisions, warrantless searches or seizures are presumed unreasonable, and any evidence discovered as a result is subject to suppression. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). An arrest supported by probable cause, however, does not require a warrant. *See State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009) (citing *Brown v. Illinois*, 422 U.S. 590, 598 (1975)); *see also* Tenn. Code Ann. § 40-7-103(a)(3) (authorizing a warrantless arrest for a felony under certain circumstances, including when the arrest is supported by "reasonable cause").

When such a warrantless arrest is made, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein*, 420 U.S. at 114. Such a determination must be made "either before or promptly after arrest." *Id*. at 125. A judicial probable cause determination made within forty-eight hours of arrest generally complies with the promptness requirement of *Gerstein*. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).

> This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.

*Id*. If a judicial probable cause determination occurs within forty-eight hours of arrest, the arrested individual bears the burden of proving an unreasonable delay. *See id*. at 56. Conversely, if such a determination does not take place within forty-eight hours, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id*. at 57. If a challenged statement is given by the accused "prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *State v. Huddleston*, 924 S.W.2d 666, 675 (Tenn. 1996).

In this case, the parties agree, as do we, that the Defendant's initial arrest on October 16, 2019, was supported by probable cause. The parties further agree that the affidavit was presented on the morning of October 18, 2019, and that the arrest warrant issued thereafter, approximately forty-four hours after the initial detention. Thus, under *Gerstein* and *McLaughlin*, the length of the Defendant's post-arrest, warrantless detention was

- 21 -

presumptively reasonable, and the Defendant has the burden of demonstrating otherwise. *See McLaughlin*, 500 U.S. at 56-57 (evaluating the promptness requirements of judicial probable cause determinations contemplated by *Gerstein*); *see also State v. Clayton*, 535 S.W.3d 829, 849 (Tenn. 2017) ("Any delay [absent the defendant's showing that it was caused by an improper purpose] . . . would not have ripened to a *Gerstein* violation until the duration exceeded forty-eight hours because it was supported by probable cause.").

In an attempt to carry this burden, the Defendant argues that Investigator Sims delayed his application for a warrant for the purpose of gathering additional information. However, a warrantless arrest supported by probable cause does not prohibit further investigation into the offense or offenses that formed the basis for the arrest. *See State v. Long*, No. E2015-01287-CCA-R3-CD, 2017 WL 2958700, at *12 (Tenn. Crim. App. July 11, 2017) ("Although . . . law enforcement continued its investigation after [d]efendant was taken to the police station, no evidence suggests that the investigation continued in an effort to establish probable cause to justify [d]efendant's warrantless arrest."); *compare Huddleston*, 924 S.W.2d at 676 (where the defendant was detained because the officer did not believe he had enough evidence to obtain an arrest warrant). The mere fact that Investigator Sims continued his investigation after his arrest of the Defendant does not equate to a Fourth Amendment violation, nor does it dispel the probable cause upon which the arrest was originally based. This is not a case, such as the example given in *McLaughlin*, where the officer needed to gather additional information to justify the arrest.

The Defendant further claims that Investigator Sims delayed the warrant application for "delay's sake," specifically, for the purpose of delaying the magistrate's setting of bail. The record does not support this contention. Investigator Sims testified that as soon as he arrested the Defendant, he transferred the Defendant to the jail staff to begin the booking process. Officer Goodwin began a report on that date, October 16, 2019. The following day, Investigator Sims observed the victim's forensic interview, reinterviewed the Defendant, obtained consent from the Defendant to collect a DNA sample and seize his vehicles for search, and received the Defendant's confession. Investigator Sims and other members of the GCSO then acted upon the consent obtained by the Defendant and the victim's mother to collect evidence for biological testing. Investigator Sims testified that, at the conclusion of these tasks, he prepared his report "late that evening" on October 17, 2019, and that he swore out the arrest warrant based upon the narrative in his report the following morning. There is no indication that Investigator Sims purposely delayed completing the necessary paperwork regarding the Defendant's arrest. To the contrary, the record indicates that he was actively working on the investigation that formed the factual basis for his lengthy report, but the existence of probable cause prior to this indicates that Investigator Sims did so in the interest of thoroughness, rather than to support the arrest itself. In light of these facts and upon our de novo review, we agree with the trial court's

conclusion that "[the Defendant] was not held unreasonably, he was not held in order to collect more evidence, and he wasn't held . . . for delay's sake. He was . . . lawfully arrested and being detained, and during that time new evidence came out, it's just how investigations go." The Defendant is not entitled to relief on this issue.

### C. Sentencing

Finally, the Defendant challenges the imposition of consecutive sentences, asserting that the effective sentence in this case did not reasonably relate to the severity of the offense and was not the least severe measure necessary to achieve its purpose. The Defendant concedes that the trial court had the authority to impose consecutive sentencing, but he nonetheless argues that it abused its discretion by aligning all sentences consecutively for an "excessive" aggregate sentence of 150 years. The State responds that the trial court properly exercised its discretion in sentencing the Defendant. We agree with the State.

When an accused challenges the length of a sentence or manner of service, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The *Bise* standard of review also applies to consecutive sentencing determinations. *State v. Pollard*, 432 S.W.3d 851, 860-61 (Tenn. 2013). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," a punishment sufficient "to prevent crime and promote respect for the law," and consideration of a defendant's "potential or lack of potential for . . . rehabilitation[.]" Tenn. Code Ann. § 40-35-102(1), (3), (5); *see Carter*, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the categories in

Tennessee Code Annotated section 40-35-115(b).  "Any one of these grounds is a sufficient basis for the imposition of consecutive sentences."  *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)).  This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the . . . grounds listed in Tennessee Code Annotated section 40-35-115(b)."  *Id.* at 861.  "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal."  *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

The trial court in this case relied upon Tennessee Code Annotated section 40-35-115(b)(5), which allows for consecutive sentencing if the court finds by a preponderance of the evidence that

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

"[N]ot all of the aggravating circumstances listed in section 40-35-115(b)(5) must be present to support the imposition of consecutive sentencing."  *State v. Doane*, 393 S.W.3d 721, 738 (Tenn. Crim. App. 2011) (internal quotations and citation omitted).  Consecutive sentences may be imposed under this section "even when one factor militates against them if the other aggravating circumstances have been established and carry sufficient weight."  *Id*. (citation omitted).

In support of his argument that the effective sentence is excessive, the Defendant cites this court's previous modification of an effective 220-year sentence imposed for sexual abuse of a twelve-year-old victim over the span of ten months.  *See State v. Hayes*, No. M2002-01331-CCA-R3-CD, 2004 WL 1778478, at *10 (Tenn. Crim. App. Aug. 9, 2004) ("Although we realize the effective sentence will in all probability exceed the lifetime of the defendant, we believe an effective sixty-six-year sentence is justly deserved and no greater than that deserved for these offenses.").  However, this court's decision in *Hayes* occurred prior to both the 2005 amendments to the Sentencing Reform Act and our supreme court's decision in *Bise*, which changed the standard of review for sentencing decisions from de novo with a presumption of correctness to the current standard of abuse of discretion with a presumption of reasonableness.

- 24 -

Additionally, the analysis in *Hayes* contains numerous examples of cases wherein lengthy consecutive sentences for child rape convictions were affirmed—including those that extended beyond the expected life of the defendant—under the less-deferential standard of review. *See, e.g.*, *State v. Zukowski*, No. M2001-02184-CCA-R3-CD, 2003 WL 213785, at *21 (Tenn. Crim. App. Jan. 31, 2003) (affirming a 125-year effective sentence for five convictions of rape of a child of a mentally impaired twelve-year-old victim by her caregiver); *State v. Suggs*, No. M1999-02136-CCA-R3-CD, 2000 WL 1521481, at *2-3 (Tenn. Crim. App. Oct. 4, 2000) (affirming a 75-year effective sentence for three convictions of rape of a child of an eight-year-old victim accompanied by disseminated recordings of the abuse); *State v. Crittenden,* No. M1998-00485-CCA-R3-CD, 1999 WL 1209517, at *3-4 (Tenn. Crim. App. Dec. 17, 1999) (affirming a 100-year effective sentence for eight convictions of rape of a child spanning eight years from the time the victim was four years old). More recent cases from this court have affirmed lengthy sentences imposed pursuant to section 40-35-115(b)(5) under the *Bise* standard of review. *See, e.g.*, *State v. Gouge*, No. E2022-01001-CCA-R3-CD, 2023 WL 3454702, at *8-10 (Tenn. Crim. App. May 15, 2023) (affirming ninety-nine-year sentence for defendant whom the victim viewed as a "de facto father figure"), *perm. app. denied* (Tenn. Sept. 11, 2023); *State v. Perry*, No. E2015-01227-CCA-R3-CD, 2016 WL 2901817, at *4 (Tenn. Crim. App. May 13, 2016) (affirming an effective sentence of 106 years for the defendant's sexual abuse and exploitation of the minor victim).

The Defendant also relies on *State v. Biggs*, 482 S.W.3d 923 (Tenn. Crim. App. 2015), which was decided post-*Bise*. However, we agree with the State that the facts of the aggravated robbery offenses in *Biggs* are distinguishable from the sexual offenses at bar, and we do not consider *Biggs* to be instructive in our analysis of the sentence imposed in this case involving the Defendant's repeated rape of his biological daughter.

The proof introduced at trial and at the sentencing hearing established that the victim looked upon the Defendant, her father, as a caregiver and authority figure; the abuse began when the victim was six years old and continued for more than a year; the sexual abuse involved repeated oral penetration, attempted vaginal penetration, and anal penetration of the victim; and the victim's residual hopelessness, fear, and self-abusiveness were caused by her developing understanding of the wrongfulness of the Defendant's conduct. The trial court expressly stated that it considered these facts in the context of Tennessee Code Annotated section 40-35-115(b)(5) to determine the proper sentence for the Defendant. Thus, the criteria for consecutive sentencing had been met, and the trial court's articulation regarding the weight given to the circumstances in this case provides sufficient basis for our review, thereby creating a presumption of reasonableness. *See Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

- 25 -

We recognize that, while conviction offenses may be the same from case to case, the circumstances of the offenses themselves are necessarily not. The trial court termed the offenses in this case the "worst [it] ha[d] ever seen." *See, e.g.*, *Zukowski*, 2003 WL 213785, at *21 (affirming a 125-year effective sentence where the trial court "ha[d]n't heard a case . . . that is any more disgusting or any more despicable"). We decline to infringe upon a trial court's discretion in sentencing when the record demonstrates that such discretion was exercised thoughtfully and deliberately with the principles and purposes of sentencing in mind. The trial court in this case had the discretion to impose consecutive sentences, emphasized its consideration of the requirement that the sentence it imposed must be justly deserved in relation to the seriousness of the offense, and articulated its belief that such criteria was met by the sentence it did impose. *See* Tenn. Code Ann. § 40-35-102(1). We conclude that the trial court did not abuse its discretion in imposing consecutive sentencing as to all counts based upon such consideration. The Defendant is not entitled to relief.

### D.     Clerical Errors in the Judgment Forms

While we affirm the judgments of the trial court, remand is necessary to correct clerical errors in the uniform judgment documents to accurately reflect the statutory service percentage of each offense, as only one designation should be marked in this section of the forms. Tennessee Rule of Criminal Procedure 36 provides that "the court may at any time correct clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission." Corrected judgment forms should be entered for counts 1 through 4 to remove the "Multiple 35%" release eligibility notation; "Child Rapist 100%" is correctly noted for these convictions for rape of a child.

A corrected judgment form should be entered for count 5 to remove the "Child Rapist 100%" release eligibility notation; "Standard 30%" is correctly noted for this conviction for attempted rape of a child. Tennessee Code Annotated section 40-35-501 does not include attempted rape of a child among the offenses for which an offender is ineligible for parole. Relatedly, Tennessee Code Annotated section 39-13-523, as in effect at the time of the offenses in this case, required a 100% service rate for rape of a child, but did not include a provision for criminal attempt to commit the offense. *See State v. Seigler*, No. M2014-02559-CCA-R3-CD, 2015 WL 4086321, at *1 (Tenn. Crim. App. July 7, 2015) ("Attempted rape of a child is *not* one of the enumerated offenses under [Tennessee Code Annotated section] 40-35-501 [for which there shall be no release eligibility], and therefore, the appellant is eligible for parole after serving thirty (30) percent of his . . . sentence."); *see also State v. Tillman*, No. M2006-01716-CCA-R3-CD, 2008 WL 1705062, at *8 (Tenn. Crim. App. Apr. 14, 2008) (holding that the correct service

percentage for a conviction of attempted rape of a child would be thirty (30) percent had the offense not merged with a conviction for aggravated sexual battery).

### III.    CONCLUSION

In consideration of the foregoing, we affirm the judgments of the trial court but remand for entry of corrected judgment forms consistent with this opinion.


 s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE